Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/18/2020 09:08 AM CDT

State of Nebraska, appellee, v.
Barbara J. Williams, appellant.
___ N.W.2d ___

Filed June 26, 2020.    No. S-19-894.

1. **Trial: Witnesses.** Whether a party may recall a witness to introduce further testimony after the party rests is within the discretion of the trial court.
2. **Motions to Dismiss: Directed Verdict.** A motion to dismiss in a nonjury trial is equivalent to a directed verdict in a jury trial.
3. **Directed Verdict: Evidence: Appeal and Error.** When a motion for a directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law.
4. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
5. **Sentences: Judgments: Appeal and Error: Words and Phrases.** An appellate court reviews criminal sentences for abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
6. **Criminal Law: Trial.** A trial court has discretion to permit a party to withdraw its rest in a trial on the merits in criminal prosecutions.
7. **Trial: Witnesses: Evidence.** It is not an abuse of discretion to permit the State to recall a witness for the purpose of filling in gaps in proof or to introduce an exhibit that the party had inadvertently failed to offer, as long as the court does not advocate for or advise the State to do so.

8. **Criminal Law: Words and Phrases.** Serious bodily injury means bodily injury which involves a (1) substantial risk of death, (2) substantial risk of serious permanent disfigurement, or (3) protracted loss or impairment of the function or any part or organ of the body.

9. **Criminal Law: Directed Verdict.** In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained.

10. **Criminal Law: Directed Verdict: Appeal and Error.** When an appellate court considers a criminal defendant's motion for a directed verdict, the State is entitled to have all of its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence. If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.

11. **Expert Witnesses.** Where the injuries are objective and the conclusion to be drawn from proved basic facts does not require special technical knowledge or science, the use of expert testimony is not legally necessary.

12. **Testimony.** There is nothing which prohibits the trier of fact from considering the victim's testimony concerning his or her own injuries to the extent the victim has knowledge of his or her injuries.

13. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

14. **Verdicts: Appeal and Error.** Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.

15. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

16. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

17. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Sarpy County: Stefanie A. Martinez, Judge. Affirmed.

Thomas P. Strigenz, Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Heavican, C.J.

## INTRODUCTION

Barbara J. Williams was convicted by the trial court of negligent child abuse resulting in serious bodily injury and sentenced to incarceration for a term of not less than 2 years nor more than 3 years. Williams appeals her conviction and sentence. We affirm.

## BACKGROUND

K.M. was born in November 1997 with leukodystrophy, a rare neurological disorder. As a result of the disorder, K.M. is blind and has only a limited ability to communicate using eye movements, facial expressions, and cooing sounds. K.M. also lacks the ability to engage in any purposeful movement other than slight movements of her head. She is confined to a wheelchair, uses diapers, and is fed with a "G-tube" through

a stoma in her abdomen. K.M. resides with her parents, upon whom she is entirely dependent.

In 2014, K.M.'s parents were using an in-home nursing agency, Interim Healthcare (Interim), to provide care for K.M. while they were at work. Williams, a licensed practical nurse employed by Interim, provided in-home nursing care for K.M. on July 17 and 18. K.M. was 16 years old at the time. Williams was charged with child abuse under Neb. Rev. Stat. § 28-707 (Cum. Supp. 2014) after K.M. was admitted to the burn unit at a medical center in Omaha, Nebraska, on July 18, with burns to her perineal area, inner thighs, and buttocks.

After her first trial ended in a mistrial and the Nebraska Court of Appeals affirmed the denial of Williams' plea in bar,[1] the case proceeded to a bench trial. The following evidence was presented:

During the week of July 14, 2014, Williams came to K.M.'s home for a training session with K.M.'s adult sister, who was providing care for K.M. K.M.'s sister testified that as part of the training session, she explained to Williams her routine of showering K.M., which began with placing K.M. on a rolling shower chair and undressing her before rolling her into the shower. Williams was shown the bathroom, shower, shower chair, and detachable showerhead. The routine included taking the showerhead from the holder and testing the water temperature prior to beginning K.M.'s shower. K.M.'s sister testified that after she explained the shower routine to Williams, Williams indicated she understood.

On the morning of July 18, 2014, K.M.'s mother observed two small "rub marks" that were between 1 and 2 inches in length in K.M.'s diaper area. K.M.'s mother testified that K.M. frequently had these marks, which were caused by the elastic on her diaper, and that Calmoseptine, a skin protectant, was applied to these marks and to the area around K.M.'s G-tube. Williams arrived and offered to shower K.M. after she and K.M.'s mother spoke about K.M.'s hair appearing greasy.

---

[1] *State v. Williams*, 24 Neb. App. 920, 901 N.W.2d 334 (2017).

K.M.'s mother agreed. Williams remained at the home to care for K.M. after K.M.'s mother left for work.

That evening, K.M.'s father arrived home from work early and was greeted at the entryway by Williams. K.M. was lying on the couch, and her legs were covered with a blanket. Williams told K.M.'s father that she had given K.M. a shower, that she had scrubbed some skin from K.M.'s diaper area, and that she had applied baby oil and Calmoseptine to the area. Williams also stated that she had recently changed K.M.'s diaper and that the diaper would not need to be changed again for a couple of hours.

Williams followed K.M.'s father into the kitchen and asked him to sign some paperwork. K.M.'s father testified that Williams presented him with two pages of paperwork. The top page, which did not contain any writing, covered the page underneath so that only the signature line on the second page was visible. K.M.'s father testified that he signed the paperwork. When he told Williams that he had never been asked to sign that type of paperwork before, she stated that it was "just routine paperwork that everybody should be filling out."

After Williams left, K.M.'s father noticed that K.M. appeared to be uncomfortable and sleepy. He repositioned her on the couch and then sat with her, watching television. K.M.'s mother joined them on the couch after she arrived home from work. K.M.'s mother observed that K.M. was acting unusual in that she appeared "zoned out" and was not responding to her mother.

Later that evening, K.M.'s mother removed the blanket from K.M.'s legs to change her diaper and noticed that K.M.'s thighs were bright red. She then pulled K.M.'s diaper down and saw that K.M.'s entire perineal area was bright red and covered with Calmoseptine. K.M.'s parents drove her to the emergency department of a local hospital in Omaha; K.M. was then transferred by ambulance to the burn unit at the medical center. K.M. remained in the burn unit for 19 days.

When K.M.'s father returned home from the hospital, he found three soiled cloth pads in the family's basket for clean laundry. There were clear liquid stains on the pads, along with a large amount of Calmoseptine and some bile. K.M.'s father testified that these pads are generally used under K.M. to catch urine, feces, or bile from K.M.'s G-tube. He also testified that he had never put soiled pads in the basket for clean laundry, nor had he ever seen soiled pads in that basket as the soiled pads are left in front of the washing machine to be laundered next.

Dr. Debra Reilly, a reconstructive plastic surgeon with a "burn fellowship," treated K.M. in the burn unit. At trial, Reilly testified that K.M. suffered burns to her perineal area, anterior thighs, posterior thighs, and buttocks. When some of K.M.'s burns had not progressed to healing after 10 or 11 days, it was determined that K.M. required skin graft surgery. During the surgery, skin was removed from one part of K.M.'s body and transplanted onto another.

Reilly testified that K.M.'s injuries were most consistent with a scald burn, where a patient had been sitting in a bathtub. The parties stipulated that when the water in K.M.'s home was left to run for approximately 2 minutes, the temperature measured 143.6 degrees Fahrenheit. Reilly estimated that based on K.M.'s age and the type of injury, she would have to have been exposed to the water for at least 10 seconds.

When Reilly was shown a picture depicting K.M.'s injury, she opined that blisters had formed on the injury because the top surface of the skin was gone. She testified that blisters usually form after a scald burn and that the liquid in a partial thickness burn blister is clear to yellow. Reilly explained that blisters can form within the first hour after a burn, or they can take up to 24 hours to form, and that if a blister pops very early on, the fluid will leak out.

Reilly testified that due to the relatively small size of K.M.'s burns, there was not a substantial risk of death from the burns. Reilly also stated that there was "no protracted functional

impairment" to K.M.'s body. When asked whether the injury involved a substantial risk of serious permanent disfigurement, Reilly stated that there was a 100-percent chance of disfigurement to some degree because the burns resulted in permanent scarring to the skin.

After Reilly finished testifying, but before the State rested its case, the State recalled K.M.'s mother over Williams' objection. During the recall, a photograph depicting K.M.'s scar was admitted into evidence. K.M.'s mother also testified about K.M.'s injuries. She stated that as a result of the burns, K.M.'s perineal area was scarred and the skin that had been grafted was now "thin, very delicate," and did not grow hair. She described K.M.'s skin as being compromised, in that K.M. now requires a special seating pad, and she said that if K.M. remains seated in her wheelchair for more than 6 hours at a time, open and blistering skin sores develop on her labia and buttocks. She also stated that K.M. is no longer able to wear jeans, shorts, or any clothing that contains a hard seam on the inside or outside of the thigh area because the seams cause irritation to the grafted skin and to the area from which the grafted skin was taken.

Interim's nurses complete both timeslips and nursing treatment care charts while they are providing nursing care for a client. Interim's administrator and director testified that the timeslips are used to document the time and dates that a nurse is with a client for payroll and billing purposes and contain a space for clients to sign off on the time documented.

Interim's nursing treatment care charts document the nurse's care of the client and contain the nurse's signature indicating that he or she completed the documentation. Interim's administrator and director testified that the client is not required to sign off on treatment care charts, but that if a client does sign off on a treatment care chart, the form cannot be blank when it is signed. She further testified that nurses are trained to fill out the care charts in real time while the service is being provided; however, there is no way to verify when the care

charts are completed or if the documented cares were actually provided.

Williams' care chart dated July 18, 2014, was presented at trial. The chart contained a two-page written narrative regarding K.M.'s care. Within the narrative were statements indicating that (1) at 8:41 a.m., Williams had given K.M. a head-to-toe assessment and that K.M.'s "peri area" and the inner cracks of K.M.'s thighs were red; (2) at approximately 10:45 a.m., Williams showered K.M. and washed her hair; (3) the skin on K.M.'s peri area, inner thighs, and buttocks was peeling, and Williams applied baby oil, baby powder, and Calmoseptine to these areas; and (4) K.M. was in good and stable condition when Williams left her in her father's care. K.M.'s father identified his signature on the last line of the chart.

At the close of the State's case, Williams made a motion to dismiss the case on the grounds that the State failed to prove Williams was negligent and failed to prove serious bodily injury. The motion was overruled. Williams did not call any witnesses and presented no evidence. Williams renewed her motion to dismiss, which was again overruled.

The district court found Williams guilty of negligent child abuse resulting in serious bodily injury. After a presentence investigation report was completed, the district court found Williams was not a suitable candidate for probation and sentenced her to a term of incarceration of not less than 2 years nor more than 3 years.

## ASSIGNMENTS OF ERROR

Williams makes the following assignments of error: (1) The district court erred in allowing the State to recall K.M.'s mother, (2) the district court erred in overruling Williams' motion to dismiss, (3) there was insufficient evidence to find Williams guilty of negligent child abuse resulting in serious bodily injury, (4) there was insufficient evidence to find Williams guilty of negligent child abuse, and (5) the district court abused its discretion by imposing an excessive sentence.

## STANDARD OF REVIEW

[1] Whether a party may recall a witness to introduce further testimony after the party rests is within the discretion of the trial court.[2]

[2,3] A motion to dismiss in a nonjury trial is equivalent to a directed verdict in a jury trial.[3] When a motion for a directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law.[4]

[4] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]

[5] An appellate court reviews criminal sentences for abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

## ANALYSIS

*Recalling K.M.'s Mother.*

Williams first assigns that the district court erred in permitting the State to recall K.M.'s mother. Williams argues that the State should not have been permitted to recall this witness because her recall was for the purpose of providing new testimony and to offer an additional exhibit into evidence.

---

[2] See *Johnson v. City of Lincoln*, 174 Neb. 837, 120 N.W.2d 297 (1963).

[3] *Kreus v. Stiles Service Ctr.*, 250 Neb. 526, 550 N.W.2d 320 (1996).

[4] *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002).

[5] *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

[6] *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015).

[6] As an initial matter, it appears this court has not yet determined the applicable standard of review for a trial court's permitting a party to recall a witness prior to resting its case. A trial court has discretion to permit a party to withdraw its rest in a trial on the merits in criminal prosecutions.[7] We conclude that the correct standard when a party has not yet rested is, similarly, an abuse of discretion.[8]

[7] It is not an abuse of discretion to permit the State to recall a witness for the purpose of filling in gaps in proof[9] or to introduce an exhibit that the party had inadvertently failed to offer, as long as the court does not advocate for or advise the State to do so.[10] In addition,

> [a] witness may be recalled for either direct or cross-examination, for the purpose of impeachment, to explain or correct prior testimony, to correct and clarify specific details, to settle the testimony given by the witness when previously testifying, to avoid potential evidentiary problems, to recant previous false testimony, or to be examined on new matters.[11]

[8] Serious bodily injury means bodily injury which involves a (1) substantial risk of death, (2) substantial risk of serious permanent disfigurement, or (3) protracted loss or impairment of the function or any part or organ of the body.[12] Prior to the recall of K.M.'s mother, Reilly testified that there was neither a substantial risk of death from K.M.'s injury nor a protracted functional impairment to the body. When asked whether the injury involved a substantial risk of

---

[7] See *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014).

[8] See, 98 C.J.S. *Witnesses* § 443 at 415 (2013) ("[t]he matter of recalling witnesses ordinarily rests in the discretion of the trial court").

[9] See *State v. Bol, supra* note 7 (citing *State v. Thomas*, 236 Neb. 84, 459 N.W.2d 204 (1990), *disapproved on other grounds, State v. Boslau*, 258 Neb. 39, 601 N.W.2d 769 (1999)).

[10] *State v. Bol, supra* note 7.

[11] 98 C.J.S., *supra* note 8, § 443 at 416.

[12] Neb. Rev. Stat. § 28-109 (Reissue 2008).

serious permanent disfigurement, Reilly stated that there was a 100-percent chance of disfigurement because the resulting scar is permanent. Because Reilly did not use the term "serious" when describing K.M.'s disfigurement, the State recalled K.M.'s mother to prove K.M.'s burns were a serious bodily injury.

During her recall, K.M.'s mother testified about the extent of K.M.'s injury and the effect of the injury on K.M. The court did not advise the State to recall her, and the recall occurred before the State had rested its case. Further, Williams was aware that K.M.'s mother would be a witness at trial, and Williams had the opportunity to cross-examine K.M.'s mother after she was recalled. The district court did not abuse its discretion in permitting the State to recall K.M.'s mother.

*Williams' Motion to Dismiss.*

In her second assignment of error, Williams claims the district court erred in overruling her motion to dismiss after the State had closed its case. Williams argues her motion should have been granted because the State failed to prove that K.M.'s injury involved a substantial risk of *serious* permanent disfigurement so as to constitute a "serious bodily injury."

[9,10] A motion to dismiss in a nonjury trial is equivalent to a directed verdict in a jury trial.[13] In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained.[14] When we consider a criminal defendant's motion for a directed verdict, the State is entitled to have all of its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence.[15] If there

---

[13] *Kreus v. Stiles Service Ctr., supra* note 3.

[14] *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017).

[15] *Id.*

is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.[16]

Williams asserts the State failed to prove that K.M.'s permanent disfigurement was "serious" because at the time the State rested, there was no evidence presented regarding the appearance of the scar or how it affected K.M. The State maintains that the testimony by K.M.'s mother regarding the disfigurement was sufficient because expert medical testimony was not required to prove K.M.'s injury was serious. We agree.

[11,12] This court has held that "'"[w]here the injuries are objective and the conclusion to be drawn from proved basic facts does not require special technical knowledge or science, the use of expert testimony is not legally necessary."'"[17] In *State v. Thomas*,[18] we stated: "There is nothing which prohibits the trier of fact from considering the victim's testimony concerning his own injuries to the extent the victim has knowledge of his injuries."

This case did not require expert testimony regarding the extent of K.M.'s disfigurement. A photograph depicting K.M.'s scar was admitted into evidence, and K.M.'s mother described the scar and the effect of the scarring on K.M. She testified that she applies lotion to K.M.'s skin in that area and that the skin is now compromised and does not grow hair. She explained that as a result of the scarring, K.M. requires a special seating pad, cannot sit in her wheelchair for longer than 6 hours at a time, and is unable to wear shorts or any clothing with a hard seam. The State presented evidence demonstrating that K.M.'s injury resulted in a serious permanent disfigurement. Therefore, the evidence was sufficient to establish

---

[16] *Id.*

[17] *State v. Costanzo*, 227 Neb. 616, 623, 419 N.W.2d 156, 162 (1988) (quoting *State v. Thomas,* 210 Neb. 298, 314 N.W.2d 15 (1981)).

[18] *State v. Thomas, supra* note 17, 210 Neb. at 300, 314 N.W.2d at 18.

serious bodily injury. The district court did not err in overruling Williams' motion to dismiss.

*Sufficiency of Evidence.*

In her third and fourth assignments of error, Williams argues that there was insufficient evidence to support her conviction.

[13] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[19] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[20]

First, Williams reasserts her claim that the State failed to prove serious bodily injury. We reject this claim, which we addressed above.

Next, Williams claims that she could not have been negligent because she did everything within her power to act appropriately in the situation and did not comprehend the extent of K.M.'s injuries. Williams asserts that the nursing treatment charts introduced at trial demonstrate that she had cared for K.M. appropriately and that no serious bodily injury had occurred. We find no merit to these arguments.

"[N]egligently," in this context, "refers to criminal negligence and means that a person knew or should have known of the danger involved and acted recklessly, as defined in section 28-109, with respect to the safety or health of the minor child."[21] Section 28-109 defines "[r]ecklessly" as

acting with respect to a material element of an offense when any person disregards a substantial and unjustifiable

---

[19] *State v. Ferguson*, 301 Neb. 697, 919 N.W.2d 863 (2018).

[20] *Id.*

[21] § 28-707(9).

risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

The State presented evidence to show that it is common knowledge that a person can be burned by water that is too hot, and because K.M. would be unable to communicate to a caregiver, a caregiver must test the water temperature prior to giving K.M. a shower. K.M.'s sister testified that Williams was shown the shower routine as part of her training session, which included first testing the water temperature. A nurse that had cared for K.M. on a full-time basis during the summer of 2013 testified that she had showered K.M. every day that she cared for her. She said that as part of the showering process, she would test the water on her hand or forearm prior to putting K.M. in the shower so as not to burn her.

In support of Williams' argument that she did not realize or comprehend the extent of K.M.'s injuries, Williams cites to Reilly's testimony that there were no blisters present in a photograph presented at trial. However, the State presented evidence to show that there were blisters present and that the blisters had popped. Evidence was also presented to show that Williams observed K.M.'s injuries and then took steps to hide them.

When Reilly was shown a picture depicting K.M.'s injury, she opined that blisters had formed on the injury because the top surface of the skin was gone. Reilly testified that blisters usually form after a scald burn and that the liquid in a partial thickness burn blister is clear to yellow. Reilly explained that blisters can form within the first hour after a burn, or they can take up to 24 hours to form, and that if a blister pops very early on, the fluid will leak out.

K.M.'s father testified that when he arrived home on July 18, 2014, Williams told him that she had recently changed K.M.'s diaper and then asked him to sign blank care treatment forms. He also testified that after arriving home from the hospital, he found soiled cloth pads with a large clear liquid stain in the family's basket for clean laundry.

[14] As an appellate court, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[22] Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.[23] Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crime of negligent child abuse resulting in serious bodily injury beyond a reasonable doubt.

*Williams' Sentence.*

In her fifth assignment of error, Williams argues that her sentence is excessive. Williams asserts that the district court failed to consider factors that made her a strong candidate for probation and that the court abused its discretion by giving the crime substantial weight. Williams claims her strong family connection, her employment at a grocery store, and the fact that she has not been charged with a serious crime for over 10 years support a sentence of probation.

[15-17] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[24] In determining a sentence to be imposed,

---

[22] *State v. Thelen*, 305 Neb. 334, 940 N.W.2d 259 (2020).

[23] *State v. Senn*, 295 Neb. 315, 888 N.W.2d 716 (2016).

[24] *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020).

relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[25] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[26]

Williams was convicted of a Class IIIA felony. The sentencing statute in effect at the time subjected Williams to a maximum of 5 years in prison.[27] Williams was sentenced to a term of incarceration of not less than 2 years nor more than 3 years.

The sentence imposed was within the statutory limits, and the record shows the district court considered and applied each of the necessary sentencing factors. Williams has a criminal history, including a conviction for third degree assault, which was reduced from a charge of use of a deadly weapon to commit a felony as part of a plea agreement; a disturbing the peace conviction, which was amended from third degree assault; and five prior charges of battery in Illinois. Further, Williams' presentence report concluded that she was in the high risk range to reoffend. We do not find an abuse of discretion in the sentence imposed.

## CONCLUSION

For the foregoing reasons, Williams' conviction and sentence are affirmed.

Affirmed.

Freudenberg, J., not participating.

---

[25] *Id.*

[26] *Id.*

[27] See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014).