IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. OLLOWAY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEROD L. OLLOWAY, APPELLANT.

Filed March 29, 2022.    Nos. A-21-516, A-21-517.

Appeals from the District Court for Douglas County: J. MICHAEL COFFEY, Judge. Affirmed.

Alton E. Mitchell, of Alton E. Mitchell Attorney at Law, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Jerod L. Olloway appeals from two separate cases. In case No. A-21-516, Olloway was sentenced to a term of probation based on a conviction of carrying a concealed weapon, second offense. Later, in case No. A-21-517, Olloway was convicted by a jury of one count of possession of a firearm by a prohibited person. Olloway's previously imposed term of probation was revoked based in part on his subsequent conviction. The cases have been consolidated on appeal.

On appeal, with respect to case No. A-21-517, Olloway asserts that the district court erred in overruling his motion for a directed verdict. With respect to case No. A-21-516, Olloway asserts that the district court erred in (1) finding that sufficient evidence existed for the court to find that he violated his probation, and (2) revoking his probation without first imposing 90 cumulative days of custodial sanctions. Upon our review, we affirm Olloway's conviction for possession of a

- 1 -

firearm by a prohibited person and the district court's decision to revoke his prior term of probation.

## BACKGROUND

On September 18, 2018, Olloway pled guilty to one count of carrying a concealed weapon, second offense, in violation of Neb. Rev. Stat. § 28-1202 (Reissue 2016), a Class IV felony. Olloway was originally sentenced to probation for a term of 1 year, however, Olloway's probation was subsequently extended through June 18, 2020. As part of the terms of his probation, Olloway was ordered to obey all city ordinances, the laws of any state, and the laws of the United States. He was also ordered to avoid social contact with persons having criminal records and not be present where illegal activity is taking place. Finally, he was ordered to not own or possess a firearm, ammunition, or any dangerous weapon.

On May 14, 2020, while Olloway was still on probation, the State charged Olloway by information with one count of possession of a deadly weapon by a prohibited person, a Class ID felony. The information alleged that the offense occurred on April 23. On May 17, the State filed a motion to revoke Olloway's probation which alleged that Olloway was charged on May 13, with possession of a firearm by a prohibited person. The State also specifically alleged that Olloway had social contact with known gang members, was present at a shooting, failed to report more than 10 times to probation, failed to provide proof of current employment or education, and owed $335 in probation fees.

A jury trial was held on March 10, 11, and 12, 2021, with respect to the charge of possession of a firearm by a prohibited person. At the beginning of the trial, the parties submitted a written stipulation which was received into evidence. The stipulation recited that Olloway was a prohibited person as defined by Nebraska statutes in that he had previously been convicted of a felony. The evidence presented by the State consisted of testimony from multiple police officers and forensic unit technicians from within the Omaha Police Department and an expert DNA analyst from the University of Nebraska Medical Center. Olloway rested his case without presenting further evidence.

The primary investigating officers were Robert Soldo and Adam Kruse, both of whom were assigned to the criminal investigations bureau of the Omaha Police Department. On the afternoon of April 23, 2020, Soldo and Kruse were assigned to patrol hotspot areas due to recent violence that had occurred. For this assignment, they were in uniform and operating a marked police vehicle. At about 4:30 p.m. they were patrolling in the area of North 29th and Pinkney Streets, when they turned southbound on 29th Street. At that location, 29th Street only extended about a block to the south and ended in a cul-de-sac. The officers observed a tan Chevy Impala parked facing the wrong direction on the west side of the road at the entrance to the cul-de-sac. The driver's side of the vehicle was about 1½ feet from the curb.

Soldo and Kruse testified that they saw four males either near the Chevy Impala or exiting the car. One male wore a blue shirt and was sitting on the curb just in front of the car. A second male wore a red shirt and was standing next to the first one near the driver's side front quarter panel of the car. A third male wore a black shirt and was also located near the car. A fourth male was exiting the backseat of the car as the officers approached.

Soldo was not initially familiar with any of the four males, but later, after reviewing video of the interaction was able to identify the person in the blue shirt as Christopher Evans. Kruse testified that he recognized the person in the red shirt as Olloway. Kruse noted that he had prior law enforcement related contacts with Olloway. Kruse also identified the male that was exiting the backseat of the vehicle as Kevin Young. Kruse spoke briefly to Young as they drove by. The officers circled the cul-de-sac and then exited the immediate area. As they drove away, Kruse, who was driving, told Soldo that he believed an active warrant existed for Young. Soldo utilized the computer in the police vehicle to check the database for warrants and found that an active felony arrest warrant did exist for Young. Upon making this discovery, the officers turned the car around in order to return to the location on North 29th Street where they had seen Young and seek to arrest him. Once back in the area of the cul-de-sac, Soldo and Kruse observed that a white four-door sedan was now parked immediately in front of the tan Impala they had previously seen. The white car was also parked facing the wrong direction, with the driver's side nearest to the curb. As Soldo and Kruse approached in their vehicle, they spotted Young first getting out of the white sedan, then looking at them, and then walking quickly away. Kruse activated the emergency overhead lights on their vehicle and pulled up onto the grass. At that point, they observed Young run behind a house. Soldo explained that after Kruse stopped their car, he jumped out and pursued Young on foot. Soldo pursued Young for a period of 5 to 10 minutes but was unsuccessful in locating him. Kruse called for assistance from other officers and drove the police vehicle through the immediate area. However, the police were unable to locate Young at that time. At the time the chase was initiated, the cameras on the police vehicle and worn by Soldo were activated. The video reveals that at that point in time, Olloway, Evans, and the unknown male wearing the black shirt remained in basically the same positions near the tan Impala where they had been observed earlier.

After breaking off the pursuit of Young, Soldo and Kruse returned to the cul-de-sac. They observed that the white sedan had left and that three males were also gone. They noted that the Impala remained parked in the same place it was previously observed. Upon approaching it, they discovered that it was running. Kruse approached the car and surveyed the area. While standing next to the car, he observed Olloway, walking northbound on 29th Street, away from the car. He testified that at that time, Olloway was approximately two blocks away.

Kruse noted that the windows on the tan Impala were partially down. Upon looking through the rear window, he saw the handle of a handgun sticking out of a brown paper bag located on the back seat of the Impala. At that point, a crime lab forensics investigation unit was requested to report to the scene to collect evidence. Once taken into police possession by the forensics investigation unit, the gun was identified as a tan-and-black Smith & Wesson .40 caliber handgun. While waiting for personnel from the forensics investigation unit to arrive, Kruse discovered a second handgun sitting on top of the front left (driver's side) tire under the wheel well. Kruse testified that this gun was very difficult to see given its color and location. Upon its seizure, the gun was identified as a black Taurus 9mm handgun. The location where it was found was near to the area where Olloway, Evans, and the unidentified male had been observed.

After the handguns were retrieved, Soldo and Kruse conducted a search of the inside of the tan Impala. They testified that during this search, they located an envelope addressed to a person with the last name of Olloway inside the glove box. The Impala had no registration, but had in-transit stickers on it. The purchaser of the vehicle lived in close proximity to Olloway.

On cross-examination, Soldo conceded that Olloway and Evans were both approximately the same distance from the quarter panel area of the tan Chevy Impala where the Taurus handgun was found. Both officers testified that they did not witness Olloway holding a gun nor did they have any indication that Olloway had a concealed gun on his person. Neither officer saw the white sedan arrive at or leave the scene.

Over the course of the month following the incident, police were able to locate Olloway, Evans, and Young. Warrants were obtained to allow police to collect buccal swabs from all three which were provided to the University of Nebraska Medical Center DNA lab for purposes of comparison to any DNA that could be located on the two handguns recovered from the Impala. The fourth individual seen near the Impala was never identified or tested.

Jaeyon Lee, who works for the Omaha Police Department Forensics Investigations Unit, testified that on April 23, 2020, she was called to respond to an address near 29th Street in Omaha. She testified that when she arrived at the address, Soldo and Kruse walked her through the scene and showed her two different areas where they found firearms. According to Lee, the Taurus firearm was found on top of the front driver's side tire and another firearm was located in the back passenger seat of the car in a paper sack. She explained that after taking the firearms, she swabbed the grips, trigger, trigger guard, slide, sights, and magazine release of the firearms for DNA evidence. She also checked the firearms for fingerprints but there were no prints that could be used for identification. She conceded on cross-examination that it would be possible for DNA to move from one item to another, but testified to the precautions taken in the lab to prevent such contamination from occurring.

Mellissa Helligso is a forensic DNA analyst employed at the University of Nebraska Medical Center. She completed a DNA analysis on swabs taken from both firearms that were located by Soldo and Kruse. She found that there were three contributors to the DNA located on the Taurus handgun. According to her analysis, the major contributor contributed 85 percent of the mixture with the two minor contributors contributing 9 percent and 6 percent of the DNA discovered. After comparing the mixture to the known samples received from Olloway, Young, and Evans, Helligso determined that Olloway could not be excluded as the major contributor of the DNA found in the mixture. She testified that given the results obtained, it is 530 septillion times more likely that the DNA found on the Black Taurus originated from Olloway and two unknown, unrelated individuals than if it originated from three unknown, unrelated individuals. The number 530 septillion is 530 followed by 24 zeros. The results of the testing indicated that it was unlikely that Evans or Young were contributors to the mixture.

With respect to the Smith & Wesson handgun, Helligso found that there were four contributors to the DNA mixture found on the firearm. According to her analysis, the major contributor contributed 91 percent of the mixture with the three minor contributors contributing 6 percent, 2 percent, and 1 percent respectively. Through her analysis, she compared Young's DNA to the mixture and found that he was not excluded as the major contributor to the Smith & Wesson firearm. She found that the DNA profile was at least 740 octillion times more likely to have originated from Young and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals. The number 740 octillion is 740 followed by 27 zeros.

Helligso also compared Olloway's DNA to the mixture found on the Smith & Wesson. According to her analysis, the DNA profile is at least 31 times more likely if it originated from

Olloway and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals. However, she also determined that it was 20.7 nonillion (30 zeros) times more likely that the sources of the DNA mixture were Young as the major contributor and Olloway as a minor contributor, as compared to originating from four unknown, unrelated individuals. The results of her testing also indicated that it was unlikely that Evans was a contributor to the DNA mixture.

On cross-examination, Helligso acknowledged that she targets having between 0.3 to 1 nanograms of material to develop a full DNA profile. However, in the present case, she detected .01777 nanograms from the swab of the Taurus handgun. However, she testified that after amplification, the sample analyzed had .2655 nanograms of DNA material. She testified that she had often been able to generate valid DNA profiles from samples below .3 nanograms and was able to do so in the present case.

At the close of the evidence, Olloway orally moved for a directed verdict which the court denied. After deliberations, the jury found Olloway guilty of the charged offense of possession of a firearm by a prohibited person.

On April 28, 2021, a hearing was held on the motion to revoke Olloway's probation in case No. A-21-516. At the hearing, the State offered into evidence the judgment of conviction and the jury verdict form with respect to Olloway's charge of possession of a firearm by a prohibited person. Olloway objected to the judgment of conviction and the jury verdict form arguing that there was insufficient evidence to support that conviction; however, the district court received both into evidence over the objection. In addition, the district court took judicial notice of the record of Olloway's trial on the charge of possession of a firearm by a prohibited person.

The State then called Jennifer Finigan to testify. Finigan is a supervisor in the probation office that oversaw Olloway's probation. In her testimony, she indicated that during his probationary period, Olloway had been charged with possession of a deadly weapon by a prohibited person. Such charge originated during the probationary period. Finigan also testified that there were several other substantive probation violations committed by Olloway. These included failing to report to his probation officer, continuing to associate with gang members, and failing to maintain employment or an educational program.

Ultimately, the district court found that Olloway violated his probation stating that "the matter of [Olloway]'s conviction you can take up on appeal" before noting that the other allegations in and of themselves were sufficient to show that his probation should be revoked. Olloway now appeals to this court.

ASSIGNMENTS OF ERROR

On appeal, Olloway assigns and argues that the district court erred by failing to grant his motion for directed verdict prior to the jury rendering its guilty verdict as to the charge of possession of a firearm by a prohibited person. He further assigns and argues that the district court erred by revoking Olloway's probation because there was not clear and convincing evidence to establish that Olloway had violated his probation by virtue of committing a law violation, and by revoking his probation without previously imposing 90 days of custodial sanctions for the alleged probation violations.

STANDARD OF REVIEW

When a motion for a directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020).

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

The revocation of probation is a matter entrusted to the discretion of a trial court. *State v. Johnson*, 287 Neb. 190, 842 N.W.2d 63 (2014). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

ANALYSIS

*Directed Verdict.*

Olloway made an oral motion to dismiss the charge of possession of a firearm by a prohibited person at the close of the State's presentation of evidence. The district court overruled his motion. On appeal, Olloway asserts that the district court erred in overruling his motion. Essentially, Olloway challenges the sufficiency of the evidence presented by the State. Upon our review, we find sufficient evidence was presented to support Olloway's conviction. Accordingly, we affirm the decision of the district court to overrule the motion for a directed verdict.

In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Williams, supra*. When we consider a criminal defendant's motion for a directed verdict, the State is entitled to have all of its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence. *Id.* If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id.*

Olloway asserts that the State failed to prove that he was in possession of the firearm because the police officers explicitly testified that they did not ever observe Olloway to be in actual physical possession of either firearm found in the Impala. In addition, Olloway asserts that the fact that there was DNA found on the firearms matching his DNA, does not, by itself, prove actual physical possession. He further argues that there was not sufficient evidence to prove he had constructive possession of the firearm. The State maintains that although the police officers did not observe Olloway with the firearm, there was circumstantial evidence, including DNA evidence, to support Olloway's possession of the firearm.

Possession of a firearm may be actual or constructive. See *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). Actual possession is defined as including only those weapons on one's person or within one's immediate control, which is the area within which one might immediately

gain possession of a weapon. *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999). Constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same. *State v. Warlick, supra.* The fact of possession may be proved by circumstantial evidence. *State v. Long*, 8 Neb. App. 353, 594 N.W.2d 310 (1999).

It is undisputed that the police officers did not observe Olloway holding a gun. Nor did they observe anything with respect to his physical appearance which indicated that he had a gun. However, the State presented evidence that Olloway was standing near the front driver's side of the Impala where the 9mm Taurus handgun was found. A piece of mail was found in the glove box of the car addressed to a person with the last name of Olloway. The owner of the car lived in close proximity to Olloway. The car was abandoned and left running by its occupants, and Olloway was spotted walking away from the scene after the officers pursued Young. The State then presented DNA evidence which established that Olloway could not be excluded as the major contributor to the DNA found on the 9mm Taurus. It was 530 septillion times more likely that Olloway was the major contributor to the DNA found on the Taurus handgun with two unknown, unrelated individuals compared to three unrelated, unknown individuals. DNA evidence also demonstrated a connection of Olloway to the Smith & Wesson handgun found in the backseat of the Impala.

A criminal conviction may soundly be based solely on circumstantial evidence regardless of whether the inferences of guilt of each line of circumstantial proof are stronger than the inferences of nonguilt. *State v. Warlick, supra*. Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Garza, supra*.

As we have stated, in a motion for directed verdict the State is entitled to have all of its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence. Given the deference that we must give to the prosecution's case, we find that there was sufficient evidence to support Olloway's conviction for possession of a firearm by a prohibited person. Therefore, there was no error by the district court in overruling Olloway's motion for a directed verdict. This assignment of error is without merit.

*Probation Revocation.*

Olloway assigns and argues that the district court erred in revoking his probation. Olloway concedes that the district court found that the noncriminal violations were sufficient in and of themselves to revoke his probation. However, he also asserts that the evidence presented at the revocation hearing did not establish that the State proved by clear and convincing evidence that he engaged in a criminal offense. Olloway argues that the district court in essence abdicated its role of independently determining whether the evidence was sufficient to establish a law violation on his part. Instead, he argues the district court simply deferred to the finding made by the jury.

It has long been the law of this state that where a criminal prosecution has been started based upon the probationer's conduct, the probation court need not wait until the conclusion of

those proceedings in order to revoke probation. *State v. Kartman*, 192 Neb. 803, 224 N.W.2d 753 (1975). In addition, this court has held that a conviction not yet final may be used by the State to prove by clear and convincing evidence that a probationer has violated the terms of his or her probation order. *State v. Sievers*, 2 Neb. App. 463, 511 N.W.2d 205 (1994).

Here, the State demonstrated by clear and convincing evidence that Olloway had committed a law violation. The evidence demonstrated the jury's finding of guilt and Olloway's conviction. In addition, the court took judicial notice of the evidence at trial. We recognize that rather than explicitly stating that Olloway had committed a law violation, the district court stated that Olloway could take up his conviction on appeal. However, when read in conjunction with the remainder of the court's remarks, the record clearly reflects that the court found that Olloway had violated his probation both by way of committing a law violation and by virtue of violating other terms of his probation. In the end, the court sustained the State's motion to revoke probation in its entirety.

On our review, we find no abuse of discretion by the district court in finding that the State proved Olloway violated his probation by clear and convincing evidence. The court relied on the jury's determination, its own recollection of the facts adduced at trial, and the testimony adduced at the hearing. This assignment of error is without merit.

*Custodial Sanctions.*

Finally, Olloway assigns and argues that the district court abused its discretion by revoking his probation without requiring the imposition of custodial sanctions prior to revocation. Specifically, Olloway argues that the district court found that the violations of his probation were "not reporting to probation at least 10 times, associating with gang members, not obtaining employment or continuing his education." Brief for appellant at 19. As such, Olloway argues that because the district court relied on noncriminal violations to revoke Olloway's probation, the district court abused its discretion by not imposing 90 cumulative days of custodial sanctions prior to revoking his probation.

For a probationer convicted of a felony, revocation proceedings may only be instituted in response to a substance abuse or noncriminal violation if the probationer has served 90 days of cumulative custodial sanctions during the current probation term. Neb. Rev. Stat. § 29-2267(3) (Reissue 2016). However, where a probationer engages in criminal conduct, and the revocation of probation is based, wholly or in part on that criminal conduct, the 90-day criminal sanction requirement is not applicable. See *State v. Jedlicka*, 305 Neb. 52, 938 N.W.2d 854 (2020).

It is undisputed that Olloway did not receive 90 days of custodial sanctions for his noncriminal or substance abuse violations. However, as we discussed above, the State proved by clear and convincing evidence that Olloway violated his probation when he illegally possessed a firearm and, as a result, was convicted of the felony offense of possession of a firearm by a prohibited person. Because Olloway committed a criminal offense while on probation, the State could institute revocation proceedings without first showing that Olloway had served at least 90 days of cumulative custodial sanctions during his current probation term. Accordingly, we find Olloway's final assignment of error to be without merit.

CONCLUSION

For the reasons set forth above, we affirm Olloway's conviction for possession of a firearm by a prohibited person in case No. A-21-517. We further affirm the district court's decision to revoke Olloway's probation and impose a statutory sentence in case No. A-21-516.

AFFIRMED.