Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/28/2022 09:08 AM CDT

State of Nebraska, appellee, v.
Raymond T. Davis, appellant.

___ N.W.2d ___

Filed February 4, 2022.    No. S-21-224.

1. **Indictments and Informations.** Whether an information is fatally defective is a question of law.
2. **Judgments: Appeal and Error.** Appellate courts independently review questions of law decided by a lower court.
3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
4. **Indictments and Informations: Appeal and Error.** An information first questioned on appeal must be held sufficient unless it is so defective that by no construction can it be said to charge the offense for which the accused was convicted.
5. **Indictments and Informations.** A complaint or information is fatally defective only if its allegations can be true and still not charge a crime.
6. ____. An information must allege each statutorily essential element of the crime charged, expressed in the words of the statute which prohibits the conduct charged as a crime or in language equivalent to the statutory terms defining the crime charged.
7. **Witnesses: Impeachment.** Generally, the credibility of a witness may be attacked by any party, including the party who called the witness.
8. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict

would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed.

Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

PAPIK, J.

Following a robbery that resulted in the victim's death, Raymond T. Davis was convicted of three felonies: first degree murder, conspiracy to commit robbery, and use of a deadly weapon other than a firearm to commit a felony. On direct appeal, Davis challenges the sufficiency of the information's charge of conspiracy, the sufficiency of the evidence to convict him, and the State's alleged impeachment of its own witness. Discerning no basis for reversal, we affirm.

## BACKGROUND

*Information.*

In 2018, Brent Quigley was found dead, apparently from stab wounds sustained during a home robbery. Following an investigation, Davis was among multiple people charged in the district court for Sarpy County in connection with Quigley's death.

Davis was charged by information with the following felonies: first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Cum. Supp. 2020); robbery, in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 2016); conspiracy to commit robbery, in violation of Neb. Rev. Stat. § 28-202 (Cum. Supp 2020); and use of a deadly weapon other than a firearm to

commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1)(a) (Reissue 2016).

Relevant here, the conspiracy charge stated:

> COUNT 3: CONSPIRACY TO COMMIT ROBBERY
>
> On or about the 24th day of June, 2018, . . . Davis, with the intent to promote or facilitate the commission of a felony, did agree with one or more persons that they or one or more of them would engage in or solicit the conduct or cause or solicit the result specified by the definition of the offense of Robbery, and he or another person with whom he conspired did commit an overt act, to-wit: Robbery in pursuance of the conspiracy, in violation of Section 28-202 . . . (CLASS II FELONY)[.]

Before trial, the district court dismissed the robbery charge on the State's motion.

*Evidence of Charged Crimes.*

At Davis' jury trial, the State presented evidence that Quigley was discovered on June 26, 2018, dead in his home amid signs of a struggle. An autopsy later determined that he had sustained numerous stab wounds, resulting in his death about 3 days before his body was found.

The investigation led to the arrests of Christopher Reagan and Alisia Cooke. Based on interviews with Reagan and Cooke, investigators identified Davis as an additional suspect. Davis was subsequently arrested in another state.

At Davis' trial, Cooke testified for the State. She testified that a week before Quigley's murder, she and Reagan were "trying to come up with ways to come up with money." After discussing various options, they settled on robbery. Cooke testified that at some point, Davis joined the discussion. According to Cooke, she talked to Reagan and Davis about her starting a social media account to obtain invitations to men's homes to exchange sex for money. Cooke testified that the three of them also discussed, as part of their plan, that once she gained access to a would-be victim's residence, she

would use text messaging to inform Reagan and Davis about the layout, any valuables, and whether there were other people or animals inside.

Cooke testified that on June 24, 2018, Quigley contacted her via the social media account Cooke set up to carry out the robbery plans. Quigley asked Cooke to have sex and get high with him in exchange for money. Cooke testified that she told Reagan and Davis that she was going to Quigley's house and that, based on her knowledge of Quigley, "if they wanted to rob somebody, that this is going to be the person." Cooke testified that both Reagan and Davis agreed to go with her to Quigley's house to rob him.

Cooke testified that she, Reagan, and Davis rode in the same vehicle to Quigley's neighborhood. While parked down the street from Quigley's residence, together, they finalized their plans. According to Cooke, they all willingly agreed that she would enter Quigley's house, text message Reagan and Davis to let them know she was inside, and make sure the door remained unlocked so that Reagan and Davis could knock Quigley unconscious and restrain him. While Cooke was still in the vehicle, Reagan and Davis looked for objects to use "to help knock [Quigley] out," and a blue "Mag-Lite" flashlight was placed in a backpack.

Cooke testified that after Quigley let her in, they began to use drugs. According to records received in evidence and Cooke's testimony, Cooke exchanged social media messages with Davis shortly before 9 a.m on June 24, 2018. In the messages, Davis told Cooke to let him and Reagan know when she was inside, confirmed the location of Quigley's dog, and instructed Cooke to "[t]ake him to the bedroom." Cooke testified that she took Quigley to the bedroom and that Reagan and Davis entered through the unlocked door, as planned. Reagan then attacked Quigley in the bedroom. Cooke testified that at one point, she saw Davis holding "a kitchen knife — or a butcher block." Cooke went to another area of the house to use drugs; from there, she heard sounds of a struggle, including

someone yelling, "'Ow,'" and someone saying, "'Get him. Hold him.'"

Cooke testified that after a "little while," Reagan and Davis checked on Cooke, and the three remained in the house for a time, using drugs, while Quigley was lying on the floor. Cooke testified that Reagan and Davis stole several items from the house, including drugs and electronics, which the three divided and used or sold. In subsequent social media messages to Cooke, Davis expressed interest in keeping a video projector and a knife.

Cooke was arrested soon after. At trial, she acknowledged that she initially "lied to" investigators about "[p]retty much everything," but testified that she eventually told them "what really happened." Cooke also admitted to lying in an earlier deposition about her history of prostitution and acknowledged her criminal history involving dishonesty. She also testified that she used methamphetamine daily prior to her arrest. Cooke's testimony at Davis' trial was part of her plea agreement for charges related to Quigley's death.

In addition to the social media messages Davis exchanged with Cooke while she was inside Quigley's residence, the State presented text messages that corroborated Cooke's version of events, including text messages between Cooke and Reagan referring to Davis' involvement in the plan. The State also presented evidence that there was activity from Davis', Cooke's, and Reagan's cell phones on cell towers in the vicinity of Quigley's house on June 24, 2018, between 10:30 and 11:02 a.m.

DNA testing could not exclude Reagan, Davis, Cooke, or Quigley as contributors to the DNA profiles obtained from swabs of a knife found under Quigley's leg. (Investigators determined this knife was not the murder weapon; their investigation showed that Reagan and Cooke gave the knife used to kill Quigley to an acquaintance for disposal.) Quigley could not be excluded as a DNA contributor to bloodstains found on jeans discovered in the vehicle Davis was using at the time

of his arrest; the jeans were in a backpack along with paperwork belonging to Davis. Quigley could not be excluded as a DNA contributor to suspected blood evidence on a blue "Mag-Lite" flashlight found at the crime scene.

*State's Impeachment of Own Witness.*

The State called Julie Skalberg to testify at trial. Skalberg identified herself as a friend of Davis' mother. She testified that on June 26, 2018, Davis and a female companion called her, and later, they arrived at her residence in Des Moines, Iowa. Davis communicated to Skalberg that he wanted to take her up on her previous offer to help him "get a fresh start of things." It is apparent from the record that, with respect to several subjects, Skalberg did not testify as the State anticipated.

On direct examination, the prosecutor asked Skalberg if Davis told her where he was coming from, and Skalberg answered, "He did not." The prosecutor then produced a copy of Skalberg's handwritten statement to law enforcement and asked her to review its contents. Skalberg reviewed the statement, which was not offered or received in evidence, and then stated, "I thought that [Davis] had told me that he had c[o]me from Council Bluffs, [Iowa,] but I cannot 100 percent say that's what — where he told [me] he came from. I just had assumed that. They never really gave me a direct point of where they were coming from."

After this statement, the prosecutor was about to continue questioning Skalberg by quoting from her statement to police, when defense counsel objected on the grounds that the statement to police was hearsay. The prosecutor said, "I'm actually impeaching her now, because I just showed her a document that she said was her statement." Defense counsel responded that the State had not "shown a need" to impeach its own witness and that "there has been nothing inculpatory said by her, nothing exculpatory said by her." The district court overruled Davis' objection.

The prosecutor continued questioning Skalberg, "Isn't it true that, in your statement, you wrote that [Davis and his companion] both said that they had — that things were getting crazy in Council Bluffs?" Skalberg agreed that was what she said and clarified that Davis and his companion "really didn't" tell her where they had come from, "[t]hey just said that things were getting crazy over there . . . [i]n Council Bluffs."

The prosecutor continued direct examination, and Skalberg testified that while Davis was at her residence, she gave him a backpack. When the prosecutor asked whether Skalberg remembered previously saying that she never gave Davis a backpack, the district court sustained defense counsel's objection based on improper impeachment, observing that the prosecutor had not used the statement to refresh Skalberg's recollection.

Skalberg further recalled on direct examination that she saw Davis break down and cry a couple of times during his 2-day stay at her residence. Skalberg testified that Davis told her he was crying because "things were getting scary and crazy, and he was fearful." Over defense counsel's objections based on improper impeachment, Skalberg testified that she did not tell the police the information she testified to about the backpack and Davis' crying.

*Verdicts and Sentencing.*

The jury found Davis guilty of first degree murder, conspiracy to commit robbery, and use of a deadly weapon other than a firearm to commit a felony. The district court accepted the verdicts and sentenced Davis accordingly.

Davis now appeals.

## ASSIGNMENTS OF ERROR

On appeal, Davis assigns three errors. He contends that the information's charge of conspiracy failed to adequately allege that Davis committed an overt act in furtherance of the conspiracy and that the evidence was insufficient to support

his convictions. He also claims that the district court erred by allowing the State to impeach Skalberg with her prior hearsay statement.

## STANDARD OF REVIEW

[1,2] Whether an information is fatally defective is a question of law. See *State v. Craig*, 181 Neb. 8, 146 N.W.2d 744 (1966). Appellate courts independently review questions of law decided by a lower court. *State v. Harris*, 307 Neb. 237, 948 N.W.2d 736 (2020).

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## ANALYSIS

*Was Information Fatally Defective?*

We begin with Davis' claim that the count of the information charging him with conspiracy to commit robbery was fatally defective. We have held that objections to the form or content of an information should be raised by a motion to quash. *State v. Walker*, 272 Neb. 725, 724 N.W.2d 552 (2006). Although our record in this case provides no indication that Davis challenged the information by filing a motion to quash in the district court, we have held that generally, defects or omissions in an indictment or information "which are of such a fundamental character as to make the indictment wholly invalid are not subject to waiver" and thus may be challenged for the first time on appeal. *State v. Coleman*, 209 Neb. 823, 825-26, 311 N.W.2d 911, 912 (1981). As we will explain

below, however, only a limited category of defects or omissions meet this standard.

[4-6] An information first questioned on appeal must be held sufficient unless it is so defective that by no construction can it be said to charge the offense for which the accused was convicted. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020). A complaint or information is fatally defective only if its allegations can be true and still not charge a crime. *Id.* An information must allege each statutorily essential element of the crime charged, expressed in the words of the statute which prohibits the conduct charged as a crime or in language equivalent to the statutory terms defining the crime charged. *Id.*

Section 28-202(1) provides that a person is guilty of the crime of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

> (a) He [or she] agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

> (b) He [or she] or another person with whom he [or she] conspired commits an overt act in pursuance of the conspiracy.

Given this statutory definition, an information charging the crime of criminal conspiracy must expressly allege one or more overt acts. See *State v. Marco*, 230 Neb. 355, 432 N.W.2d 1 (1988). See, also, Neb. Rev. Stat. § 29-2014 (Reissue 2016). In this case, Davis contends that the information failed to do so. Although he acknowledges that the information identified an overt act—"Robbery[,] in pursuance of the conspiracy, in violation of [§] 28-202"—he takes the position that the State may not, as it did here, allege that robbery was both the object of the conspiracy and an overt act committed in pursuance thereof. We disagree.

In support of his argument, Davis relies on *State v. McKay*, No. A-92-057, 1993 WL 13458 (Neb. App. Jan. 26, 1993) (not approved for permanent publication). In that case, the criminal

conspiracy charge asserted that the defendant agreed with one or more other people that they would "'harvest more than one pound of marijuana'" and that the defendant or one or more of the other alleged conspirators committed "'an overt act in pursuance of the conspiracy, to-wit: Defendant along with [another person] conspired together to harvest and possess more than one pound of marijuana.'" *Id.* at *1. The Nebraska Court of Appeals found that the information was fatally defective. It explained that the information impermissibly identified the alleged conspirators' act of "conspir[ing] together" as the overt act. *Id.* at *2.

This case is distinguishable from *McKay*. While *McKay* found that a criminal conspiracy charge may not allege that a defendant agreed with others to commit a criminal offense and then identify that agreement as the overt act in furtherance of the conspiracy, the information at issue here did not do so. Rather, it alleged that Davis agreed with others to commit robbery and then identified robbery as an overt act in furtherance of that agreement.

Davis does not direct us to any cases in which a court has held that an information cannot allege that the same crime was both the object of the conspiracy and an overt act committed in pursuance thereof. And in fact, our recent decision in *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020), runs to the contrary. In *Theisen*, the defendant faced conspiracy charges for the underlying offenses of delivery or distribution of hydrocodone and tramadol. The overt act alleged was "'buying and/or selling [hydrocodone and tramadol].'" *Id.* at 601, 946 N.W.2d at 685. The defendant argued that to satisfy the overt act requirement, the State was required to allege an overt act other than the crime the parties conspired to commit. We rejected the defendant's argument and found the information's allegations that the defendant was "'buying and/or selling [hydrocodone and tramadol]'" were sufficient. *Id.*

To the extent our decision in *Theisen* left any room for Davis to argue that the conspiracy charge in this case was

fatally defective, we would still disagree. One purpose of an overt act requirement is to ensure that criminal liability attaches only when an agreement to commit a crime has advanced beyond "mere talk." *U.S. v. Gigante*, 982 F. Supp. 140, 169 (E.D.N.Y. 1997). We have also recognized that an overt act "tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime." *State v. Heitman*, 262 Neb. 185, 198, 629 N.W.2d 542, 553 (2001). When one or more conspirators have actually committed the offense that is the object of the conspiracy, the agreement has certainly advanced beyond the discussion stage and there has been an unmistakable manifestation of an intent to accomplish the crime.

Given the foregoing, it is not surprising that consensus appears to exist among courts and commentators that prosecutors may *prove* that a defendant committed an overt act in furtherance of a conspiracy by demonstrating the commission of the substantive offense that was the object of the conspiracy. See, *Word v. United States*, 589 F. Supp. 806, 807 (S.D.N.Y. 1984) ("the government is free to enumerate and prove, as overt acts to a conspiracy count, completed substantive crimes which were the object of the conspiracy"); *State v. Less*, 170 W. Va. 259, 265, 294 S.E.2d 62, 67 (1981) ("substantive crime which is the object of the conspiracy can be proven as the overt act"); *People v. Glubo*, 5 N.Y.2d 461, 477, 158 N.E.2d 699, 709, 186 N.Y.S.2d 26, 40 (1959) ("[w]hile the overt act need not be of itself a criminal act and need not constitute the very crime that is the object of the conspiracy . . . nevertheless it may well be, and frequently is" (internal quotation marks omitted) (emphasis omitted)); 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(b) at 375 (3d ed. 2018) ("the overt act may be the substantive offense which was the object of the conspiracy"). We thus see no reason why the State may not, as it did here, satisfy the overt act requirement by alleging the substantive offense which was the object of the conspiracy as the overt act.

*Sufficiency of Evidence.*

We turn now to Davis' contention that the evidence was not sufficient to support his convictions. When such a challenge is made, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). Davis makes no assertion that the State failed to present evidence of the essential elements of the charged offenses. Instead, Davis argues that we cannot base our assessment of the sufficiency of the evidence on Cooke's testimony because of her past history of dishonesty regarding facts material to Davis' criminal proceeding. And without alleging prosecutorial misconduct, Davis submits that the State's reliance on Cooke's testimony deprived him of a fair trial and due process.

Davis insists that he is not asking this court to reweigh the evidence, but we cannot escape the conclusion that this is precisely what Davis wants us to do. And "that is not the role of an appellate court." *State v. Jones*, 296 Neb. 494, 499, 894 N.W.2d 303, 307 (2017). The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021). Cooke's testimony, with all its credibility issues, was presented to the jury for consideration, and we cannot ignore it. When we evaluate this testimony along with the other evidence at trial as our standard of review requires, without determining its weight or credibility, the basis for Davis' assigned error on this point crumbles.

The jury was tasked with deciding whether to convict Davis of first degree murder, criminal conspiracy to commit robbery, and use of a deadly weapon other than a firearm to commit a felony. See, § 28-303; §§ 28-202 and 28-324(1); § 28-1205(1)(a). The crime of first degree murder can entail felony murder, that is, killing another person in the perpetration or attempt to perpetrate a robbery or other specified

crimes. See, § 28-303(2); *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008). Viewing the evidence in the light most favorable to the State and considering the statutory elements of the crimes charged, we conclude there was sufficient evidence for a rational trier of fact to convict Davis on all counts.

The jury heard Cooke's testimony that Davis participated with Cooke and Reagan in a plan to go to Quigley's home and use force to take Quigley's property. Davis helped gather objects to use to beat Quigley. Once Cooke was inside Quigley's residence, Davis used social media messages with Cooke to ensure the scheme went according to plan. While Cooke interacted with Quigley, Davis entered Quigley's residence with Reagan. At some point, Cooke observed Davis holding "a kitchen knife — or a butcher block," and after going to another area of the house, she heard sounds of a struggle. The next time she saw Quigley, he was lying on the floor. As planned, Cooke, Reagan, and Davis took items from Quigley's house. In social media messages to Cooke, Davis expressed interest in keeping particular items that they had taken.

Quigley was later found dead from stab wounds. Cooke's version of the events that preceded and followed Quigley's death was corroborated by social media messages, text messages, DNA evidence, and other circumstantial evidence. Cell towers near Quigley's house detected activity from Davis', Cooke's, and Reagan's cell phones around the time other evidence showed they were there. The State presented the social media messages that Davis and Cooke exchanged just before Davis and Reagan entered Quigley's residence and afterward. DNA evidence showed signs of Quigley's DNA on a blue "Mag-Lite" flashlight found at his house, the same type of flashlight Davis helped gather in anticipation of beating and robbing Quigley. DNA testing could not exclude Reagan, Davis, Cooke, or Quigley as contributors to the DNA profiles obtained from swabs of a knife found underneath Quigley.

Nor could Quigley be excluded as a DNA contributor to bloodstains found on Davis' jeans.

Abiding by our standard of review, we conclude that the evidence was sufficient to support Davis' convictions and find no merit to this assignment of error.

*Impeachment of Own Witness.*

[7] Finally, Davis assigns that the prosecution improperly impeached its own witness, Skalberg, with her prior statement to police that Davis and his companion told her things were "getting crazy" in Council Bluffs, Iowa. Generally, the credibility of a witness may be attacked by any party, including the party who called the witness. *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015). One means of attacking the credibility of a witness is by showing inconsistency between his or her testimony at trial and what he or she said on previous occasions, but a party cannot impeach his or her own witness without limitation. See *id*. Impeachment of a party's own witness by means of a prior statement may not be employed as a "mere subterfuge" or for the "primary purpose of placing before the jury substantive evidence which is not otherwise admissible" when the party is aware prior to calling the witness that the witness will not testify consistent with the witness' prior statement. *Id.* at 491-92, 860 N.W.2d at 746 (internal quotation marks omitted) (emphasis omitted). This rule "focuses upon the content of the witness' testimony as a whole" so that "if the witness' testimony is important in establishing any fact of consequence significant in the context of the litigation, the witness may be impeached as to any other matter testified to by means of a prior inconsistent statement." *Id.* at 492, 860 N.W.2d at 746 (internal quotation marks omitted).

Davis asserts that the State should not have been allowed to impeach Skalberg with prior statements to police about Council Bluffs, because her testimony as a whole was "trivial." Brief for appellant at 12. However, we question whether the State actually impeached Skalberg on this issue with a prior

inconsistent statement. Here, Skalberg readily affirmed what she had told police and then provided further explanation. Skalberg initially testified that Davis did not tell her where he had come from. After reviewing her prior statement to police, Skalberg testified that she believed Davis had told her that he had come from Council Bluffs, but she was not certain, and that it was possible she only assumed he was coming from there. She then stated that Davis and his companion never gave her "a direct point of where they were coming from." Over Davis' objection alleging improper impeachment, the State was permitted to continue, "Isn't it true that, in your statement [to police], you wrote that [Davis and his companion] both said that they had — that things were getting crazy in Council Bluffs?" Skalberg affirmed that she had made that statement to police, but clarified that Davis and his companion "really didn't" tell her where they had come from; "[t]hey just said that things were getting crazy . . . [i]n Council Bluffs."

[8] Even assuming without deciding that the foregoing exchange was improper impeachment by the State, we conclude that any such error was harmless and not grounds for reversal. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Davis claims that the jury should not have heard Skalberg's statement to police that Davis and his companion said things were "getting crazy" in Council Bluffs. But we cannot discern how this statement had any bearing on the jury's verdicts. We therefore conclude that the jury's guilty verdicts were surely unattributable to any impeachment of Skalberg with her prior statement.

## CONCLUSION

Finding no merit to the errors alleged by Davis, we affirm.

Affirmed.