IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SCHALLER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

STACEY B. SCHALLER, APPELLANT.

Filed May 3, 2022.    No. A-21-404.

Appeal from the District Court for Cheyenne County: DEREK C. WEIMER, Judge. Affirmed.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

INTRODUCTION

Stacey B. Schaller appeals from his conviction in the district court for Cheyenne County for two counts of third degree sexual assault of a child. Schaller assigns error to the court allowing the State to amend the information a second time and admitting prior bad acts evidence for the jury's consideration. He also claims that there was insufficient evidence to convict him and that he received ineffective assistance of trial counsel. For the reasons set forth herein, we affirm.

STATEMENT OF FACTS

*Original Charges.*

On October 6, 2020, the State filed an information in the district court, charging Schaller with two counts of third degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-320.01(3) (Reissue 2016), both Class IIIA felonies. Specifically, the first count alleged that "on or about September 2018 through December 2019," Schaller subjected A.D., born in 2007, to

- 1 -

sexual contact when Schaller was over 19 years of age and A.D. was 14 years of age or younger. The second count alleged that Schaller had subjected A.D. to such sexual contact "on or about January 2020 through July 2020."

Schaller filed a motion to quash, alleging that the allegations were overly broad and vague, violating Schaller's constitutional rights including his right to due process. Schaller also alleged that the information failed to state the dates of the alleged offenses with any degree of reasonableness or certainty. The court denied Schaller's motion, finding the allegations in the information conformed to the law and were sufficient as to the dates alleged.

*First and Second Amended Informations.*

On January 25, 2021, in expectation of a negotiated plea agreement, the State filed an amended information, charging Schaller with one count of attempted third degree sexual assault of a child in violation of § 28-320.01 and Neb. Rev. Stat. § 28-201 (Cum. Supp. 2020), a Class IV felony. During plea negotiations, Schaller made an offer to enter a plea to the reduced charge, which was accepted by the State on January 25. Schaller subsequently changed his mind, withdrew from the plea agreement on February 9, and chose to proceed to trial. The following day, the district court granted a motion to continue the trial filed by the State, and trial was scheduled for March 23-24.

On February 24, 2021, the Stated filed a motion for leave to amend the information, "to reinstate the original charges and to allege the offense date range in each count in conformity with the evidence, i.e.[,] on or after September 1, 2018 and before July 31, 2020."

At the hearing on the State's motion for leave to amend, Schaller's attorney did not object to the amendment of the information to reflect the original two charges; he did, however, object to the expansion of the dates of the alleged offenses. The district court asked Schaller's attorney whether the expansion of the dates proposed in the State's motion to amend the information would "cause concerns for trial preparation." Schaller's attorney expressed his intention at that point "to keep the trial date as set," if possible, although he had not specifically spoken to Schaller "regarding the dates and whether or not that create[d] a problem for [them]."

In a memorandum order entered on March 16, 2021, the district court addressed both the State's motion for leave to amend and a motion to determine admissibility of certain evidence, which we address further below. The court granted the State's motion for leave to amend, noting that a trial court has discretion to permit amendment of a criminal information at any time before the verdict or findings if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced. It also noted the exact time of the commission of an offense is not a substantive element in the charge or proof thereof unless the statute involved makes it so or is clearly intended to have that effect. The court found that the amendment of the dates requested by the State was permissible under *State v. Martinez*, 250 Neb. 597, 550 N.W.2d 655 (1996) and that it did not detrimentally impact Schaller's ability to prepare for trial or present defenses.

*Motion to Admit Evidence of Prior Sexual Misconduct.*

On January 22, 2021, during a pretrial hearing and hearing on a motion by the State to endorse additional witnesses, the State advised the district court and Schaller it intended to file a motion to determine the admissibility of evidence pursuant to Neb. Rev. Stat. § 27-414 (Reissue

2016). The State subsequently filed this motion on February 11, after Schaller's withdrawal from the plea agreement referenced above. On March 5, Schaller filed a motion in limine, seeking to exclude, among other things, testimony by certain witnesses on the basis that it was not admissible under § 27-414 and violated Neb. Rev. Stat. § 27-403 (Reissue 2016).

On March 10, 2021, the district court heard the State's motion to determine the admissibility of evidence under § 27-414. At the start of the hearing, the court referenced Schaller's motion in limine, and his attorney indicated that it could either be heard then or at a later date. The court suggested to "get through the 414 stuff first," after which the parties could sort out how to proceed on the motion in limine. The State presented testimony from four witnesses: one of Schaller's younger sisters, Schaller's wife, the victim in this case, and a brother of the victim.

Schaller's younger sister testified about prior sexual offenses by Schaller against her occurring between approximately 1987 and 1990, beginning when she was about 7 years old and Schaller was 14 years old. Schaller's sister was 40 years old at the time of her testimony and Schaller was just short of 48 years old. Schaller's sister last spoke with him in August 2020, and she described their relationship as strained.

Schaller's sister described instances of being restrained by Schaller and then digitally penetrated by him on multiple occasions in each of 3 different locations on the family property (the family station wagon, Schaller's bedroom, and the dining room). She did not recall any other family member directly witnessing any of these incidents, although other family members would have been in the vehicle during the station wagon incidents. The sister described feeling trapped during these incidents.

An incident of sexual contact between Schaller and his sister occurred in a fourth location in the residence (the parlor or "fancy" living room). During that incident, Schaller was seated on the couch with the sister facing and straddling him when he exposed his erect penis and put her hand on it. The sister was not aware of anyone witnessing the incident.

One final incident occurred after the family moved to rural Wayne County. The sister was about 12 years old and Schaller was about 19 when he came into the sister's bedroom at night and got into her bed with her. The sister crawled over him, left the room, and immediately went to her parents' room and told them that Schaller got into her bed. All of the incidents described in the sister's testimony, except for the last incident, occurred prior to when she reached puberty around age 11 or 12. The sister could not recall any dialogue with Schaller during any of the incidents.

Before disclosing these offenses to law enforcement in connection with the investigation in the current case, the sister disclosed them to a friend when they were children and then to her husband prior to their marriage. When the sister was about 10 years old, a friend (an 11-year-old girl) told her that she was being abused by "an unsafe person;" the sister told the friend that "that had happened to [her], too." The sister did not provide specific details about the abuse when she disclosed it to her husband.

The sister did not tell her parents what Schaller did to her when she was a child, testifying that she did not have "the language" to report it then, but she did tell her sister and father what happened prior to testifying in this case. At some point, the sister participated in a rape victim support group for around 6 or 12 weeks. Before attending the group, the sister looked into whether charges could be brought against Schaller, but she learned that the statute of limitations had run, so she did not contact law enforcement at that time. Schaller's sister only attended kindergarten

- 3 -

prior to her mother's cancer diagnosis in 1987. She was homeschooled thereafter and did not participate in any sex education classes as a child. She testified that she was not vindictive toward Schaller but that she felt angry about "how [his] choices have affected people and the consequences of them."

Schaller's wife testified at the § 27-414 hearing. She indicated that they began dating in February 2013 and married in April. They first lived together in Battle Creek, Nebraska; moving to Sidney, Nebraska in September 2018. The wife has six children from a prior relationship, the youngest of which is A.D., the victim in this case. Another of the wife's prior children is K.D., the victim's brother who also testified at the hearing. A.D. was not quite 6 years old when Schaller moved into the wife's home in Battle Creek. The wife noted that A.D. attended school from kindergarten through second grades, but she was homeschooled the rest of the time they lived in Battle Creek.

The wife testified about an occasion when A.D. was about 9 years old, and the wife found Schaller lying next to A.D. in A.D.'s bed. The wife had been sleeping on the couch and thought she heard Schaller go into the bathroom. She then got up to go to bed and found Schaller "just settling down next to [A.D.] in [her] bed." The door to A.D.'s room was completely open at that point and could not be closed due to clutter on the floor. The wife asked Schaller what he was doing, and he said "he was cold and he wanted to snuggle." According to the wife, she told Schaller, "well, you're not doing it in here," after which they went to their own bedroom. The wife did not observe Schaller engaged in any inappropriate touching of A.D.

The wife also testified that before they married, Schaller told her that he had touched one of his younger sisters "down below" over a period of a few months when he was 12 years old after having received a pornographic magazine in the mail (although the wife did not recall the exact wording he used). She testified that Schaller had wanted to "clear the air, tell his secret" before their marriage. According to the wife, Schaller also told her he quit touching the sister but that he had been "hooked on pornography" ever since.

A.D., who was 13 years old at the time of the § 27-414 hearing, testified about Schaller subjecting her to sexual touching on multiple occasions, with many incidents occurring prior to the incidents charged in the present case. According to A.D, when she was 8 or 9 years old, Schaller would come into her bedroom almost every night and rub her vagina, touching mostly on top of her clothing but sometimes underneath. She usually wore pajama pants and a T-shirt, and he wore pajama pants or boxer shorts. She testified that she would be lying on her back and Schaller would be on his side. A.D. testified that Schaller told her the area he was touching on her was a "pretty shape." A.D. recalled six other people living in the house at the time, but she did not recall anyone walking in during any of these touching incidents. A.D. explained that the touching did not begin until after second grade when she was being home-schooled. She estimated that she was 9 years old or almost 10 when Schaller stopped touching her vagina. During the time A.D. attended school, she did not have any sex education classes.

According to A.D., Schaller continued touching her after they moved to Sidney when she was about 11 years old, but instead of touching her vagina, he touched her breasts on two occasions. A.D. discussed Schaller being physically affectionate with her, to the extent that she became uncomfortable with how much he hugged her, had her sit on his lap, and cuddled with her. He did not show the same level of physical affection to her brothers.

- 4 -

A.D. did not immediately report any of these incidents of sexual contact, explaining that she "didn't know it was wrong." In September 2020, she eventually disclosed what happened to her oldest sister via a social media message, which stated that Schaller "put his hand up my shirt one time. It was scary. I didn't know what to do." After that, she also told a cousin. Finally, A.D. disclosed Schaller's touching to her mother after law enforcement came to the residence to investigate the allegations.

On cross-examination, A.D. was confronted with a statement she made to a forensic interviewer (and in a later deposition) that the vaginal touching had occurred "every night" for about a year. In response, A.D. testified that now in "[l]ooking back," she remembered that "it wasn't every single night." She agreed that Schaller did not touch her genital area after they moved to Sidney and only touched her breasts on two occasions. She estimated that each incidence of genital touching had lasted for about 30 to 45 minutes, and she stated that Schaller did not put anything inside her. A.D. agreed Schaller did not threaten her or tell her to not disclose what happened and did not restrain her. She acknowledged being unhappy living in Sidney and that she wanted to go live with her cousins in Alliance. She also agreed the some of her family members either disliked or hated Schaller.

On redirect examination, A.D. confirmed that Schaller never put his finger or anything else inside her, that she never saw his penis or genital area, and that he never asked her to touch him.

A.D.'s brother K.D., who was 17 at the time of the § 27-414 hearing, testified about what he felt was an inappropriate incident he observed between A.D. and Schaller while they lived in Battle Creek when A.D. was 8 or 9 years old. K.D. observed Schaller sit down on the couch in the living room and A.D. sit straddling Schaller's lap while facing Schaller. The brother then observed Schaller start touching A.D.'s lower back and underwear with his hand going underneath her nightgown. At the time, the brother was hiding behind or under something in the room to avoid contact with Schaller. The brother continued to hide for 10 to 15 minutes while Schaller and A.D. remained in the room, but afterwards, he confronted A.D. and asked her "about why she let [Schaller] do that." A.D. responded the she did not feel it. The brother did not tell his mother (Schaller's wife) about the incident, but he did tell his oldest sister (the sister referenced in A.D.'s testimony).

The brother also testified that he saw Schaller go into A.D.'s bedroom alone several times a week when they lived in Battle Creek, where he would usually sit on her bed and talk. The brother confirmed that Schaller did not show him as much or similar physical affection to what he showed A.D. Schaller also came into the brother's room regularly, but he did so to talk to his biological son, who shared a room with the brother. According to the brother, it was also not unusual for Schaller to enter the children's rooms to pray with them.

Following the above testimony from witnesses called by the State, Schaller's attorney recalled Schaller's wife. The wife testified that she thought she always knew when Schaller left their bedroom at night during the time they lived in Battle Creek, but she acknowledged that she might not have always awakened when he did so. On cross-examination by the State, the wife testified that she and Schaller usually went to bed at the same time but that he sometimes continued to use his computer after she went to sleep. The wife agreed that she did not know the exact location of everyone in the house when she was in the bedroom she shared with Schaller and further

acknowledged that she slept with a sound machine that makes white noise. The wife also stated that she sometimes left the house at night to pick up her oldest son.

On March 15, 2021, the district court heard further argument from Schaller in support of his motion in limine. Schaller also presented evidence in support of a second motion in limine in which he sought to exclude evidence of certain communication he had with the pastor of his church on the basis of "clergyman privilege."

In its March 16, 2021 memorandum order, the district court ruled on the State's motion to determine the admissibility of certain evidence under § 27-414. The court outlined the evidence presented at the 414 hearing and set forth a detailed analysis of each witness' testimony under the relevant statutory requirements and case law. The court found that the evidence of Schaller's alleged prior sexual abuse of his sister as well as evidence of the alleged prior sexual contact between Schaller and the victim while residing in Battle Creek would be admissible at trial. However, the court determined that evidence concerning observations by the victim's brother of what he felt was an inappropriate incident between Schaller and the victim would not be admissible. We have set forth further details of the court's analysis as necessary in our analysis below.

In a separate memorandum order, also entered on March 16, 2021, the district court set forth its rulings on Schaller's motions in limine. With respect to Schaller's objections to the evidence sought to be admitted by the State "in the 414 hearing," the court referenced its more detailed analysis in the order ruling on the State's motion. The court denied Schaller's motion in limine as it related to the testimony of his sister and the victim's testimony regarding purported incidents in Madison County. The court granted Schaller's motion in limine regarding the testimony of the victim's brother regarding purported incidents in Madison County. The court's other rulings on topics raised in Schaller's first motion in limine are not relevant to this appeal. The court denied Schaller's second motion in limine with respect to the asserted clergyman privilege.

*Jury Trial.*

A two-day jury trial began March 23, 2021. Before the State's presentation of evidence, Schaller renewed his objection to the second amended information. His attorney argued, "We believe that it's incumbent upon the court to require the state to allege specific dates within a reasonable period of time rather than a block of two years." The district court overruled Schaller's objection. We also note that during the State's opening argument, the prosecutor referenced having "Rule 414 evidence," at which point Schaller's attorney objected that the prosecutor should not be allowed to make "those statements" because the evidence referenced "violate[d] 27-413, 27-414 and 27-403." The court stated that "for this line of inquiry throughout the process and for reasons previously stated the court will overrule the objection." After the parties' opening statements, trial proceeded with testimony from the State's witnesses, which we summarize.

Investigator Amanda Barrett with the Sidney Police Department testified that on September 4, 2020, she was contacted by a case worker with the Nebraska Department of Health and Human Services (the Department) about an intake she had received concerning the Schaller family. Barrett testified that representatives from both the Department and law enforcement typically go on "intakes like this." Barrett did not contact the Schaller family on September 4 because she and the

case worker wanted to arrange forensic interviews for the children first and those ended up being scheduled for September 6. Barrett explained that a forensic interview is performed by a trained interviewer who specializes in interviewing children. Barrett's role in this intake was to assist with "the interviews and the investigation of the intake."

On September 6, 2020, Barrett, another officer, and the case worker went to the Schaller residence in Sidney and made contact with Schaller's wife, A.D., K.D., and Schaller's son. Barrett told the wife about the intake and obtained the wife's consent to interview the children. Schaller was not at home initially, but he arrived shortly after the wife called him. Barrett spoke with Schaller, explained the allegations and intake, and told him that they wanted to interview the children. According to Barrett, Schaller became upset, stated that he did not believe the allegations, and stated that "people were out to get him." He did not want his son to be interviewed.

Barrett then took A.D. and K.D. for their forensic interviews, which she observed. After the forensic interviews, Barrett interviewed the wife at the police department; Schaller declined to be interviewed. Additionally, Barrett also spoke with two of the wife's older children (including the older sister of A.D. referenced above), who were the individuals who had called in the intake. A.D.'s sister provided a screenshot of a social media messaging conversation she had had with A.D. After A.D.'s forensic interview, arrangements were made for A.D. to live with an aunt in the Scottsbluff area for a while.

A.D. testified about living with her aunt for various periods in 2020, including for part of the summer and from September to December, following her disclosure of sexual abuse by Schaller. She testified that she enjoyed living with her aunt and spending time with her cousins, stated that she felt safe there, and agreed that while there during the summer of 2020, she was allowed to wear more revealing clothes and get manicures. A.D.'s disclosure about Schaller's sexual touching came about a week after she returned from her summer visit to the aunt's house.

When A.D. was asked whether Schaller had ever touched her inappropriately when they lived in Battle Creek, Schaller renewed his objection to that topic "based on 27-414, 27-413 and 27-403," which the district court overruled but noted as a continuing objection. A.D.'s testimony about Schaller's touching and rubbing of her vagina while they lived in Battle Creek as well as her testimony about the breast touching incidents in Sidney were consistent with her pretrial testimony. A.D. testified to two separate incidents of Schaller touching her breasts, which occurred a few weeks apart in Sidney.

A.D. first disclosed Schaller's inappropriate touching to her older sister in September 2020 by sending her a social media message "along the lines of [Schaller] has touched me before." She also talked to a cousin and one of her older brothers. A.D. did not disclose the touching right away because she "didn't know it was wrong at first" and when she learned that it was wrong, she "thought it was too late." She also testified that she did not tell her mother prior to the law enforcement investigation because she "didn't know anything was wrong," "thought there was no point in telling her," and had "thought it was normal and it happened to everybody." A.D. described an incident where Schaller tried to get her alone to pray with her, which she thought was "really strange" and it scared her because she "thought he was going to do something to [her]." She testified, "I had enough of being afraid in my own household, so I finally told someone." A.D. testified, however, that she was "not out to get [Schaller]."

A.D.'s older sister, who was 28 years old at the time of trial, testified that she was contacted at some point by their brother (the other reporting individual), who told her that A.D. was afraid of Schaller. This worried the older sister, so she began contacting A.D. through social media messaging. The older sister testified that after she received messages from A.D., she did not contact the Department herself, but she continued "talking to [A.D.]" while her husband called "the CPS hotline." According to the older sister, she was the first person to suggest that A.D. live with the aunt after the sexual abuse was disclosed. The older sister confirmed that she provided screenshots of the messages between her and A.D. to law enforcement.

As with A.D.'s testimony about any prior sexual offenses committed by him, Schaller renewed his objection under "27-403, 27-414 and 27-413" to any testimony by his wife about any such offenses. The district court overruled the objection but noted it as a continuing objection. The wife's testimony about the incident when she observed Schaller in A.D.'s bed and his disclosure about having touched his younger sister when they were children was consistent with her pretrial testimony. The wife testified that Schaller was 48 years old at the time of trial and confirmed that A.D. was 13. She again testified that A.D. attended private school in Battle Creek for 2 years, that she was homeschooled thereafter, and that the family moved to Sidney in September 2018. According to the wife, the decision to have A.D. homeschooled was made more by Schaller than by her. In describing their sleeping arrangements while living in Battle Creek, the wife noted that Schaller would have been able to leave their bed without crawling over her. She again testified that they used a sound machine in the bedroom to block noise and stated that she would leave the house at night a couple of times per week to pick up her son from a town about 10 miles away. The wife testified that she preferred Schaller to leave the door open if he went into any of her children's bedrooms. On a couple of occasions, she found Schaller sitting next to A.D. on A.D.'s bed when the bedroom door was closed. According to the wife, A.D. began wearing different clothes, using makeup, and getting manicures before she spent two weeks staying with her aunt during the summer of 2020.

A.D.'s brother K.D. testified generally about his relationship and interactions with both Schaller and A.D. Although he testified that he felt Schaller treated him and A.D. differently and that he was sometimes concerned by Schaller's physical interactions with A.D, he did not testify about the specific incident between A.D. and Schaller that the district court excluded in its pretrial rulings.

The pastor of the church of which Schaller was a member testified about certain interactions with Schaller. Prior to becoming the senior pastor at Schaller's church where he had served for about 3.5 years, the pastor had spent 10 years working in law enforcement. Schaller taught an adult Bible study at the church and provided some volunteer computer services. Schaller and the pastor also did some recreational target shooting together, and the pastor had considered Schaller a friend at the time.

On September 6, 2020, Schaller contacted the pastor and told him that Department and law enforcement representatives were at Schaller's house. The pastor went to the house and spoke to Schaller, who told him that the Department intake "had to do with the state of his home" and "something to do with inappropriate touching." The following day, the pastor met with Schaller at the pastor's residence. They arranged for the pastor to keep some firearms Schaller had while the investigation was ongoing and also discussed the Department intake. When the pastor asked

Schaller about it, Schaller queried "how could anybody know what my house looks like." The pastor told him that "it had to have been somebody who's been in your house." The pastor then asked Schaller about the other intake issue of inappropriate touching and stated, "it's not like you fondled her or touched her or something like that." Schaller responded to this statement by commenting "yeah, that probably happened." At that point, they stopped discussing the intake and talked about other matters.

After this conversation with Schaller, the pastor contacted the district superintendent for his church and was advised that he needed to report to law enforcement any issues dealing with acts done to children. The pastor then contacted Schaller and explained that he would have to report the details of their conversation to law enforcement, to which Schaller replied that "you've got to do what you got to do." The pastor subsequently went to the police department and submitted a written voluntary statement.

As with the other witnesses who had testified at the pretrial § 27-414 hearing, Schaller renewed his objection "on the basis of 27-403, 27-413 and 27-414" prior to the testimony of his younger sister. The district court overruled the objection but noted Schaller's continuing objection. Schaller's sister testified about the sexual offenses committed against her by Schaller between 1987 and 1990 consistent with her pretrial testimony. At trial, she also explained that she made the decision not to disclose the sexual abuse by Schaller while their mother was still alive because hearing the allegations would have been difficult for her. However, their mother had died the previous year.

After the State rested, Schaller's attorney made a motion for a directed verdict, which was denied by the district court. Schaller then rested without presenting any evidence.

*Verdict and Sentence.*

The jury found Schaller guilty on both counts of the second amended information, and the district court accepted the verdicts. The court subsequently sentenced Schaller to 3 years' imprisonment on each count of third degree sexual assault of a child, to be served concurrently, and granted him credit for 224 days' time served. The court also ordered Schaller to serve 18 months' post-release supervision and notified him of the requirement to comply with the Nebraska Sex Offender Registration Act.

ASSIGNMENTS OF ERROR

Schaller asserts (1) the district court erred in allowing the State to amend the information a second time, (2) the court erred in admitting prior bad acts evidence for the jury's consideration, and (3) there was insufficient evidence to convict him.

Schaller also asserts "[he] was prejudiced by [i]neffective [a]ssistance of [c]ounsel;" however, assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). By stating only that he "was prejudiced" by ineffective assistance of trial counsel, Schaller has not alleged deficient performance with the required specificity. Thus, we do not consider this assignment of error further.

STANDARDS OF REVIEW

A ruling on whether to allow a criminal information to be amended is made by the trial court in its discretion. *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Davis*, 310 Neb. 865, 969 N.W.2d 861 (2022). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

ANALYSIS

*Amendment of Information.*

Schaller asserts that the district court erred in allowing the State to amend the information a second time. At the hearing on the State's motion, Schaller's attorney did not object to the amendment of the information to reflect the original two charges. He did object to the expansion of the dates of the alleged offenses in the second amended information, while acknowledging the court's ruling on Schaller's earlier motion to quash based on the date ranges alleged in the original information. Schaller's attorney had not specifically spoken with him about whether the dates alleged in the second amended information would create a problem in terms of their trial preparation, but he expressed a desire to proceed with the trial dates then scheduled.

A trial court, in its discretion, may permit a criminal information to be amended at any time before verdict or findings if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced. *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011). Further, a criminal information may be amended specifically to conform to the evidence adduced at trial. See *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984). See, also, *State v. Wiemer*, 3 Neb. App. 821, 533 N.W.2d 122 (1995).

Schaller's objection at the time of the hearing on the State's motion to amend was to the date ranges expressed for the offenses alleged in the second amended information. The exact time when a criminal offense is committed is not an essential element of a crime unless the statute defining the offense makes a date or time an indispensable element of the crime charged. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). Other than defining the respective ages of the perpetrator and the victim, § 28-320.01 does not make a date or time an indispensable element of

the crime charged. Schaller's and A.D.'s ages at the time of the acts of sexual contact were alleged in the original information. The original information advised Schaller in count I that he needed to defend himself against an allegation that he subjected A.D. to sexual contact, occurring sometime between September 2018 and December 2019, when A.D. was 14 years of age or younger and when Schaller was over 19 years. In count II, it advised Schaller that he needed to defend against an allegation that he subjected A.D. to such sexual contact, occurring sometime between January and July 2020. The second amended information combined those time periods to allege in both counts that Schaller subjected A.D. to sexual contact sometime between September 1, 2018 and July 31, 2020. The second amended information did not alter the essential elements of the crime alleged in either count. Thus, the second amended information did not expand the number of allegations against which Schaller was required to defend or the overall period during which he was alleged to have subjected A.D. to sexual contact.

On appeal, Schaller cites *State v. Martinez*, 250 Neb. 597, 550 N.W.2d 655 (1996) and argues that "to be charged with the same dates and the same type of allegation without any identifying factors to show that they are separate and distinct, the Court allowed for double jeopardy against [Schaller]." Brief for appellant at 28. This argument fails for several reasons. First, Schaller did not raise a double jeopardy objection before the district court. A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal. *State v. Reinhart*, 283 Neb. 710, 811 N.W.2d 258 (2012) (declining to address double jeopardy claim because defendant failed to raise it in trial court). Second, the present case does not involve any of the three distinct abuses protected against by the Double Jeopardy Clause. *State v. Kelley*, 305 Neb. 409, 940 N.W.2d 568 (2020) (Double Jeopardy Clause protects against second prosecution for same offense after acquittal, second prosecution for same offense after conviction, and multiple punishments for same offense). The evidence at trial clearly established two distinct instances of Schaller's sexual contact of A.D. Finally, Schaller misconstrues the Nebraska Supreme Court's ruling in *Martinez*.

In that case, the Nebraska Supreme Court observed that where an information provides a timeframe which has a distinct beginning and an equally clear end within which the crimes are alleged to have been committed, it is sufficient to satisfy the requirements of the Sixth Amendment. *State v. Martinez, supra*. The court noted that "to hold otherwise would impose an impossible burden on a child sexual assault victim where there are allegations of multiple assaults over a lengthy timeframe." *Id.*, 250 Neb. at 599, 550 N.W.2d at 657. The court then observed that the State may allege a timeframe for its allegations of sexual assault of a child in its first prosecution; as a quid pro quo to ensure that this liberty is not abused, the State must survive double jeopardy scrutiny if it attempts a second prosecution based upon the same transaction during the same timeframe. *Id.* Unless the offense charged in a second prosecution is clearly separate and apart from the offense charged in the first prosecution, the timeframe alleged in the first prosecution acts as a blanket bar for subsequent prosecutions. *Id.* Finally, the court noted that if, at the time an information is filed, the State knows of all facts and all possible charges arising from one transaction or series of transactions within a timeframe, and if nothing prevents the State from filing all charges in one information, then there is no reason that the State need attempt a series of prosecutions of one charge at a time rather than prosecute all charges at once. *Id.*

Clearly, the present case does not involve a second prosecution based upon the same transaction during the same timeframe. The State was aware of allegations of two instances of sexual contact by Schaller against A.D. occurring in the timeframe alleged in the second amended information, and it permissibly filed both of those charges in the same information. However, any subsequent prosecutions based upon the same transaction during the same timeframe would have to survive double jeopardy scrutiny.

The district court did not abuse its discretion in granting the State's motion for leave to amend the information a second time. As discussed above, the exact time of the commission of an offense is not a substantive element in the charges in this case. The amendment of the dates requested by the State provided a timeframe for each count with a distinct beginning and an equally clear end within which the crimes are alleged to have been committed and is permissible under *State v. Martinez*, 250 Neb. 597, 550 N.W.2d 655 (1996). Finally, there is nothing in the record to show that the amendment detrimentally impact Schaller's ability to prepare for trial. Schaller's assignment of error fails.

*Section 27-414 Evidence.*

Schaller asserts that the district court erred in admitting prior bad acts evidence for the jury's consideration. He argues that the State did not prove by clear and convincing evidence that the assaults of his sister or the additional assaults of A.D. occurred, and that the risk of prejudice outweighed the probative value of the evidence.

Before addressing these arguments, we also note additional arguments by Schaller with respect to testimony by the victim's brother and the victim's sister. Schaller argues that they should not have been allowed to testify at trial about § 27-414 evidence, but the record does not show that either of these witnesses testified at trial to any such evidence. And, in its pretrial order, the district court specifically ruled that evidence concerning observations by the victim's brother of what he felt was an inappropriate incident between Schaller and the victim would not be admissible. This incident was not referenced in the brother's trial testimony. Schaller also argues that the sister's testimony that the victim gave her information was hearsay and should not have been allowed. Schaller's attorney objected on hearsay grounds to certain references to social media messaging conversations between the victim and her sister, but he has not assigned error to any such evidentiary rulings. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). Schaller also references several other statutes under which he argues that testimony from his sister, the victim, and the victim's brother should have been excluded, but he did not object on the basis of any of these statutes at trial. To preserve a claimed error in admission of evidence, a litigant must make a timely objection, which specifies the ground of the objection to the offered evidence. *State v. Muse*, 15 Neb. App. 13, 721 N.W.2d 661 (2006). See, also, *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021) (objection based on specific ground and properly overruled does not preserve question for appellate review on some other ground not specified at trial).

Turning to the error specifically assigned and argued by Schaller, we first note that § 27-414 allows evidence of prior offenses of sexual assault to prove propensity. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Section 27-414(1) explicitly provides that evidence of the

accused's commission of another offense of sexual assault may be considered for its bearing on any matter to which it is relevant. *State v. Valverde, supra*. Under § 27-414(2), the prosecuting attorney is to disclose to the accused, at least 15 days before trial, the evidence that is expected to be offered. *State v. Valverde, supra*. Schaller's arguments on appeal focus on the balancing test set out in the third subsection of § 27-414. Section 27-414(3) provides:

> Before admitting evidence of the accused's commission of another offense or offenses of sexual assault under this section, the court shall conduct a hearing outside the presence of any jury. At the hearing, the rules of evidence shall apply and the court shall apply a section 27-403 balancing and admit the evidence unless the risk of prejudice substantially outweighs the probative value of the evidence. In assessing the balancing, the court may consider any relevant factor such as (a) the probability that the other offense occurred, (b) the proximity in time and intervening circumstances of the other offenses, and (c) the similarity of the other acts to the crime charged.

See, also, § 27-403 (although relevant, evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues, or misleading jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence).

In applying the required balancing test, the district court first reviewed the evidence offered at the § 27-414 hearing with respect to the other offenses against both Schaller's sister and the victim and found the evidence of these other offenses clear and convincing. Thus, it concluded that the probability of these offenses occurring was high. Schaller references but does not explicitly challenge the court's findings with respect to probability on appeal.

Next, the district court addressed the proximity of the alleged other offenses to the charged offenses against the victim. With respect to the other offenses against Schaller's sister, the court found no question that there is a substantial temporal distance between the alleged offenses against Schaller's sister and the charged offenses in this case (alleged prior offenses occurred between approximately 1987 and 1990). The court observed that this did not mean that the evidence with respect to Schaller's sister was not admissible, citing *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012) (temporal remoteness goes to weight and does not render evidence of other crime, wrong, or act irrelevant and inadmissible) in support of this conclusion. As to the other offenses against the victim, the court determined that those offenses were close in temporal proximity to the crimes charged.

Schaller does not challenge the district court's finding with respect the proximity between the other offenses against the victim and the charged offenses. He does argue, however, that the prior offenses against his sister should be excluded based on the difference of 30 years or more between the last alleged offense against his sister and the current charged offenses against the victim. We agree with the district court's conclusion that the temporal distance between the prior offenses against Schaller's sister and the current charges is a matter of weight and not admissibility. The admissibility of evidence concerning other conduct must be determined upon the facts of each case, and no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is too remote. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). The question whether evidence of other conduct is too remote in time is largely within the

discretion of the trial court. *Id.* While remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence. *Id.*

Finally, under the plain language of § 27-414(3)(c), the court is to compare the similarity of the other acts to the crime charged. *State v. Valverde, supra*. In this case, the district court addressed the similarity between the prior offenses and the charged offenses. With respect to the prior offenses involving Schaller's sister, the court observed that the offenses involving Schaller's sister and those charged in this case both involved sexual contact with a minor female and a victim residing in the same home as Schaller. The court also noted differences, including the fact that Schaller's sister was a pre-pubescent minor at the time of the alleged acts by Schaller and that the victim in this case had reached puberty by the time of the charged offenses by Schaller. The court also noted that the alleged offenses against Schaller's sister allegedly involved digital penetration, whereas the charged offenses against the victim in this case involve Schaller touching the victim's breasts. In balancing the similarities and differences between these offenses, the court stated "that these similarities and differences go the weight to be given to the prior offenses and not their admissibility." The court concluded that the State had met its burden of proof under § 27-414 with respect to the allegation of other offenses against Schaller's sister. In his arguments on appeal, Schaller focuses on the differences, but in the context of comparing offenses in the framework of § 27-414, "overwhelming similarity" is not required. *State v. Valverde, supra*, 286 Neb. at 298, 835 N.W.2d 732 at 746.

With respect to the other offenses alleged to have occurred in Madison County against the victim, the district court observed that those offenses were similar to the charged offenses in that they all involved the same victim and non-penetrative sexual touching, but that they were dissimilar in terms of the location on the victim's body where the touching occurred. The court again determined that this was a matter of weight rather than admissibility, and it concluded that the State had also met its burden of proof under § 27-414 with respect to the alleged Madison County offenses against the victim.

Based on our review of the record, we find that the district court did not abuse its discretion by admitting the § 27-414 evidence for the jury's consideration at trial. Contrary to Schaller's assertions, the court did conduct the required balancing test, and its assessment of the balancing of the probability, proximity, and similarities between the alleged prior offenses and the charged offenses is consistent with our own review of the record. We agree with the district court that the probative value of both the conduct against Schaller's sister and the Madison County conduct against A.D. outweighed the risk of prejudice to Schaller. Accordingly, the district court did not err in receiving the evidence of these events under § 27-414.

*Sufficiency of Evidence.*

Schaller was charged with two counts of third degree sexual assault of a child in violation of § 28-320.01. "A person commits sexual assault of a child in the second or third degree if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older." § 28-320.01(1). "Sexual contact" is defined in § 28-318(5) as "the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts." That subsection also states that sexual contact "includes only such conduct which can be reasonably

construed as being for the purpose of sexual arousal or gratification of either party." § 28-318(5). "Intimate parts" are defined in § 28-318(2) as "the genital area, groin, inner thighs, buttocks, or breasts."

In proving sexual contact, the State need not prove sexual arousal or gratification, but only circumstances and conduct which could be construed as being for such a purpose. *State v. Osborne*, 20 Neb. App. 553, 826 N.W.2d 892 (2013). When an element of a crime involves existence of a defendant's mental process or other state of mind of an accused, such elements involve a question of fact and may be proved by circumstantial evidence. *State v. Burke*, 23 Neb. App. 750, 876 N.W.2d 922 (2016). The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). Circumstantial evidence is not inherently less probative than direct evidence. *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016).

In this case, the jury found the evidence was sufficient to support a conviction for two counts of third degree sexual assault of a child. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as these matters are for the finder of fact. See *State v. Davis*, 310 Neb. 865, 969 N.W.2d 861 (2022). The evidence shows that when Schaller was at least 19 and A.D. was younger than 14, he touched her breasts on two different occasions in Sidney. A.D. also testified about the earlier incidents in Battle Creek during which Schaller touched and rubbed her vagina both on top of and under her clothing. Schaller's sister testified about Schaller's prior sexual offenses against her. Schaller's wife testified about finding Schaller lying next to A.D. in A.D.'s bed on one occasion when he wanted to "cuddle" and sitting next to A.D. in the bedroom with the door closed on other occasions. She also testified about Schaller's report of "touching" his sister when they were children. The pastor testified about his conversation with Schaller about the Department intake, during which Schaller commented with respect to the allegations of inappropriate touching that "that probably happened." The jury, as fact finder, was tasked with resolving conflicts in this evidence and evaluating the credibility of the witnesses. There was circumstantial evidence from which the jury could find that Schaller touched A.D.'s breasts on two separate occasions and that his conduct was intentional and for the purpose of his sexual arousal or gratification. Viewing and construing the evidence most favorably to the State, we find the evidence was sufficient to support the jury's finding that Schaller was guilty of two counts of third degree sexual assault of a child.

CONCLUSION

The district court did not abuse its discretion in allowing the State to amend the information a second time. The evidence of Schaller's prior misconduct was properly admitted. The evidence was sufficient to sustain Schaller's convictions for third degree sexual assault of a child. Accordingly, we affirm.

AFFIRMED.